Rel: March 21, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2023-0794

_____

## W.S. II

### v.

## Houston County Department of Human Resources

_____

## CL-2023-0805

_____

## E.A.

### v.

## Houston County Department of Human Resources

## Appeals from Houston Juvenile Court
## (JU-21-344.02)

## On Return from Remand

PER CURIAM.

In separate appeals, W.S. II ("the father") and E.A. ("the mother") challenged a judgment of the Houston Juvenile Court ("the juvenile court") terminating their parental rights to their child, E.H.S. ("the child"), on the ground that the juvenile court lacked subject-matter jurisdiction over the termination-of-parental-rights action under the Uniform Child Custody Jurisdiction and Enforcement Act ("the UCCJEA"), § 30-3B-101 et seq., Ala. Code 1975. On May 31, 2024, this court, on original submission, concluded that the record was "without sufficient information [for us] to conduct a meaningful review of the jurisdictional question" and remanded the case with instructions to the juvenile court to determine whether, under the UCCJEA, it had subject-matter jurisdiction. W.S. v. Houston Cnty. Dep't of Hum. Res., [Ms. CL-2023-0794, May 31, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024). We instructed the juvenile court to supplement the record on appeal with any evidence on which it had relied from the earlier dependency action involving the mother and the father and with any evidence it had elicited from additional proceedings that it conducted following remand.

2

The juvenile court has made a return from remand and supplemented the record as requested. Having now reviewed the record as supplemented, we conclude that the juvenile court had jurisdiction over the action of the Houston County Department of Human Resources ("DHR") to terminate the mother's and the father's parental rights. We also conclude that, on the merits, the juvenile court's judgment is due to be affirmed.

<u>Subject-Matter Jurisdiction Under the UCCJEA</u>

The record following remand shows that the juvenile court held a hearing on remand that consisted solely of arguments of the parties' attorneys; the juvenile court did not receive evidence during that hearing. After the hearing, the juvenile court entered a judgment in which it found that it had "properly exercised jurisdiction in this termination action." To reach that conclusion, the juvenile court wrote, it considered the transcript of a June 23, 2022, hearing in the prior dependency action involving the parents, the preprinted-form order of June 23, 2022, finding the child dependent and transferring custody of the child to DHR, and the initial preprinted-form order of shelter care entered on November 10, 2021, all of which are contained in the supplement to the record on return

from remand but which were not included in the record on original submission of this matter. The shelter-care order included a handwritten notation that the juvenile court had taken "emergency jurisdiction" over the matter. On the form order of dependency, the juvenile court wrote without elaboration that it had "jurisdiction based on facts presented."

The transcript of the June 23, 2022, hearing in the dependency action indicates that, at the outset of that hearing, the juvenile-court judge advised the attorneys that, on the issue of jurisdiction, "I think I did attempt to get up with Judge Gay in Florida, and I don't recall if I had a -- I'm pretty sure I never got a response back. I've called Florida several times on many cases and I never get responses back." The juvenile-court judge then said: "But the child is in Alabama, and I'm going to find that Alabama has jurisdiction because the child is in Alabama, and I have not had any contact with anybody in the Florida judicial system regarding this child, so I'm going to find that I do have jurisdiction."

The transcript from the hearing in the dependency action contains little evidence that would be helpful in determining whether the juvenile court had subject-matter jurisdiction under the UCCJEA. One witness

4

was called during that hearing -- Anna Starling, the DHR caseworker assigned to work with the mother and the father. Neither the mother nor the father was present at the hearing. Starling testified that the mother was incarcerated immediately after giving birth to the child, that she had not remained incarcerated in Houston County but had been incarcerated in the "Baldwin County, Florida," jail upon her return to Florida, and that Starling had not had any contact with the mother. She also testified about her conversation with the father, whose paternity at that time had not been adjudicated.

In its judgment following remand, the juvenile court found that the mother gave birth to the child in Alabama "in an effort to prevent Florida … from discovering the child's birth" and that she was then arrested and removed to Florida. The mother's actions, the juvenile court found, "were the direct cause of the placement of the child in foster care in Alabama and effectively resulted in Alabama becoming the home state of the child." The juvenile court further found that, because the mother and the father had been incarcerated in Florida at various times since the child's birth, "there is no home or support system for the child in Florida, nor is there any reasonable expectation for such in the foreseeable future.

5

Indeed, there is no evidence of any connection this child has or had with Florida or evidence that the child has ever physically been in that state."

Section 30-3B-201(a), Ala. Code 1975, provides that, except in certain circumstances not relevant to this appeal, an Alabama court has jurisdiction to make an initial child-custody determination in the following circumstances:

> "(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

> "(2) A court of another state does not have jurisdiction under subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Section 30-3B-207 or 30-3B-208 [of this chapter], and:

> > "a. The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

> > "b. Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

> "(3) All courts having jurisdiction under subdivision (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to

6

determine the custody of the child under Section 30-3B-207 or 30-3B-208 [of this chapter]; or

"(4) No court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2), or (3)."

Regarding the first of these four bases for subject-matter jurisdiction under the UCCJEA (home-state jurisdiction), the UCCJEA defines "home state," in pertinent part, as

"[t]he state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned."

§ 30-3B-102(7), Ala. Code 1975. In H.T. v. Cleburne Cnty. Dep't of Hum. Res., 163 So. 3d 1054, 1065 (Ala. Civ. App. 2014), this court, after analyzing the term "lived from birth" and surveying decisions of other jurisdictions, held that "a limited hospital stay in a state following birth, without more, is insufficient to establish a home state for the child as that term is defined by § 30-3B-102(7)[, Ala. Code 1975]." 163 So. 3d at 1065. In reaching that holding, we relied in part on In re D.S., 217 Ill. 2d 306, 317-18, 840 N.E.2d 1216, 1223 (2005), in which the Illinois Supreme Court observed that "allowing a temporary hospital stay to confer 'home state' jurisdiction would undermine the public policy goals of the

7

UCCJEA, which include ensuring that 'a custody decree is rendered in that State which can best decide the case in the interest of the child.'" (Emphasis and citation omitted.)

Here, the dependency proceeding involving the child was initiated within days of the child's birth. Neither parent had ever lived in Alabama and there is no evidence indicating that either intended to live in Alabama. The mother testified that she had no connection to Alabama other than driving to Dothan once her labor started so that she could give birth to the child in Alabama. Thus, the child did not live with a parent from birth in Alabama before to DHR's commencement of its dependency action, and Alabama was not the child's home state. See H.T. v. Cleburne Cnty. Dep't of Hum. Res., 163 So. 3d 1054, 1065-66 (Ala. Civ. App. 2014).

The parents suggest that Florida is the child's home state. However, it is undisputed that the child was born in Alabama and has never resided in the Florida, whether with a parent or otherwise. Thus, under the plain language of § 30-3B-102(7), Florida could not be considered the child's home state, and a Florida court would not have had home-state jurisdiction over the child under § 30-3B-201(a)(1).

As noted above, under subdivision (a)(2) (significant-connection jurisdiction), when the court of another state does not have home-state jurisdiction over a child, an Alabama court can exercise jurisdiction over the child when (1) the child and a parent or a person acting as a parent has a significant connection with Alabama, and (2) substantial evidence is available in Alabama concerning the care, protection, training, and personal relationships of the child. The undisputed evidence indicates that the only connection between either of the child's parents and Alabama was the mother's delivery of the child in an Alabama hospital while she was attempting to elude Florida authorities. Before the mother left the hospital, she was arrested and held in jail until Florida law-enforcement officials could pick her up to return her to that state. The mother's brief physical presence in Alabama was not sufficient to confer significant-connection jurisdiction on the juvenile court. See A.M. v. Houston Cnty. Dep't of Hum. Res., 262 So. 3d 1210, 1217-18 (Ala. Civ. App. 2017).

We also cannot conclude that a Florida court would have had significant-connection jurisdiction over the child. The record does not disclose any evidence indicating that the child had a significant

9

connection to Florida or that substantial evidence was available in Florida regarding her care, protection, training, and personal relationships. See A.M. v. Houston Cnty. Dep't of Hum. Res., 262 So. 3d at 1218.

The third basis for the exercise of subject-matter jurisdiction under § 30-3B-201(a) is triggered when a court of another state with subject-matter jurisdiction over a child declines to exercise that jurisdiction because an Alabama court is the more appropriate forum to determine the child's custody. § 30-3B-201(a)(3). There is no evidence in the record indicating that a court of Florida or any other state declined to exercise jurisdiction over the child, nor is there any indication that the juvenile court declined jurisdiction in favor of a court of another state. Thus, neither the juvenile court nor a court of any other state could have obtained jurisdiction over the child pursuant to subsection (a)(3).

We turn, then, to the fourth and final jurisdictional basis of § 30-3B-201(a), that is, when "[n]o court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2), or (3) [of this section]." § 30-3B-201(a)(4). As noted above, the record fails to disclose a basis under subsections (a)(1), (a)(2), and (a)(3) for the exercise

of jurisdiction by a Florida court over the child. Specifically, the record indicates that Florida was not the child's home state, that the child did not have a significant connection with Florida, and that the juvenile court did not decline to exercise jurisdiction over the child in favor of a Florida court. The record also fails to disclose a basis on which a court of any other state could have exercised jurisdiction over the child. As a result, we conclude that the juvenile court obtained jurisdiction over the child to make an initial award of child-custody under § 30-3B-201(a)(4) and that, having obtained that jurisdiction, it had continuing, exclusive jurisdiction under § 30-3B-202 over DHR's petition to terminate the parents' parental rights. See, e.g., A.M., 262 So. 3d at 1218.

In his special writing, Presiding Judge Moore reaches the same result by a different path, concluding that the juvenile court properly exercised jurisdiction over this matter because its temporary emergency jurisdiction "ripened" into home-state jurisdiction when the juvenile court entered its dependency judgment. We disagree.

There is no question that the juvenile court had temporary emergency jurisdiction to award DHR custody of the child at the outset of this matter. See § 30-3B-204(a), Ala. Code 1975. However, it is well

11

settled that "a juvenile court exercising temporary emergency jurisdiction under § 30-3B-204[, Ala. Code 1975,] does not have jurisdiction to adjudicate dependency and award custody by virtue of the limited jurisdiction provided to it." J.D. v. Lauderdale Cnty. Dep't of Hum. Res., 121 So. 3d 381, 385 (Ala. Civ. App. 2013).

Section 30-3B-204(b) provides:

"If there is no previous child custody determination that is entitled to be enforced under this chapter and a child custody proceeding has not been commenced in a court of a state having jurisdiction under Sections 30-3B-201 through 30-3B-203, [Ala. Code 1975,] a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under Sections 30-3B-201 through 30-3B-203. If a child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under Sections 30-3B-201 through 30-3B-203, a child custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child."

(Emphasis added.) The phrase "a child custody determination made under this section" refers only to an order that temporarily disposes of a child's custody in an emergency pursuant to a juvenile court's temporary emergency jurisdiction. Because a court's temporary emergency jurisdiction, in and of itself, does not confer jurisdiction on a juvenile court to decide subsequent issues of dependency, the legislature cannot

12

have intended a <u>later</u> dependency judgment -- one that follows the temporary order and to which § 30-3B-204(b) does not refer -- to serve as the kind of order that can become a final custody determination under § 30-3B-204(b).

Relatedly, under § 30-3B-204(b), to become a "final determination," the emergency order providing for that temporary disposition must provide, explicitly, that it is intended to be a final custody determination. By relying on the finality of the juvenile court's later dependency judgment as satisfying this requirement, Presiding Judge Moore's special writing tacitly acknowledges that the juvenile court's temporary emergency order did not, itself, provide that it was to be a final determination as the plain language of § 30-3B-204(b) requires.

We recognize that Presiding Judge Moore's interpretation of § 30-3B-204(b) enjoys the support of some appellate court decisions from other jurisdictions. We are more persuaded, however, by the plain language of § 30-3B-204(b), which, in our view, does not permit a court's temporary emergency jurisdiction to ripen into the kind of permanent jurisdiction that would allow for a finding of dependency or a termination of parental rights unless the initial emergency order itself -- not a later dependency

order -- explicitly provides that it is a final determination. We note that we are not alone in so holding. <u>See, e.g.</u>, <u>In re E.D.</u>, 812 N.W.2d 712, 721-22 (Iowa Ct. App. 2012) (holding that, even if it had been established that no custody action involving the child was pending in another state or that another state is not intending to initiate such an action, "the temporary emergency order must provide that it becomes a final determination if no such actions exist or are pending").

Having concluded that the juvenile court properly exercised jurisdiction over this matter pursuant to § 30-3B-201(a)(4), we proceed to a consideration of the merits of the parties' other contentions.

<u>The Mother's Additional Arguments</u>

The father's only contention on appeal is that the juvenile court lacked jurisdiction under the UCCJEA. Having disposed of that argument, we conclude that the juvenile court's judgment is due to be affirmed relative to the father's appeal. The mother, however, raises additional contentions on appeal, and we turn now to a consideration of those arguments, starting first with a recitation of the relevant evidence.

In addition to the evidence relevant to the issue of subject-matter jurisdiction, which we set forth in our opinion on original submission, the

14

juvenile court elicited the following evidence at the October 30, 2023, trial in the action to terminate the mother's and the father's parental rights. Starling testified that DHR became involved with the mother and the child when they both tested positive for illegal substances when the child was born. The mother acknowledged that she abused methamphetamine while she was pregnant with the child, and she confirmed that the child tested positive for that drug when she was born.

The child was the youngest of the mother and the father's seven children. The parental rights of the mother and the father to their oldest six children were terminated in Florida before the child was born. The mother testified that the original allegation against her had been that her younger brothers had burned her children with cigarettes, although she had disputed that. She also claimed that she did not use methamphetamine until after the oldest four children were removed from her custody. She said that her fifth and sixth children were taken from her because they tested positive for illegal drugs when they were born.

The mother testified that she was aware that the father was a former drug dealer but, she said, he did not start abusing illegal drugs himself until after the older children were removed from their home. The

15

father acknowledged that he had used methamphetamine because he had been going through a period of depression. Like the mother, the father had served time in prison on drug-related convictions.

The mother said that, although they had never married, the father and she had been in a relationship for 12 years. At the time of the trial, she said, they were no longer together, although they remained friends. However, the month before the trial, the mother posted on social media that she was in a relationship with the father. She said that she did that to show the father's girlfriend that the father still loved the mother.

The father testified that he had been released from incarceration in Florida in May 2022 after serving time for violating his probation and "running from the police." He said he had eluded the police because they were trying to arrest him for something for which he claimed to be innocent, and he did not "want to just go lay down" because he knew the mother was pregnant. He said that the underlying convictions involved charges of aggravated assault with a deadly weapon, battery, and resisting arrest. However, he said, he pleaded guilty to lesser offenses that he did not specify.

16

At the time of the trial, the father said, he lived in Florida with the girlfriend of a family friend and her young son. The family friend was in prison. The father said he had lived with them for four months. He said that he had rented a portion of their mobile home for $250 per month and that there was room for the child to live with him there. The father acknowledged that, in the past, his living arrangements had been unstable and that he did not have transportation. He also said that he had had two or three jobs in 2023. At the time of the trial, he said, he had worked at a solar-panel company for about one month. Before that, the father said, he had worked about seven months for a company that was going through what he said was a "rough patch" and he had had to take a cut in pay, so he left for a better job at the solar-panel company.

The father testified that he was turning his life around and that he considered himself a role model for children. After being released from jail, the father said that, on his own initiative, he had taken part in individualized therapy and a substance-abuse assessment and parenting classes at a facility in Florida. He also contacted DHR and visited with the child when he could but conceded that he had missed numerous visits.

17

He also ended some visits early because, he said, he respected the child's wishes to go with the foster parents.

The father said that he would participate in services offered in Alabama to the best of his ability but that it was difficult because he was a Florida resident and was not eligible for some services. Starling said that, once the father's paternity was established in May 2023, DHR had offered him several services and had attempted to make referrals for services in Florida but that many places had not responded to the phone calls DHR had placed to them. The father did make use of the services offered by one of the facilities, Starling said, but it had not reported to DHR that the father had completed assessments and services as it usually did. She said that the concerns DHR had with the father were his history of drug use and housing instability. Starling also testified that, because the parents' parental rights to the older six children had been terminated, DHR was not required to offer services to the father.

The father admitted the results of a hair-follicle drug test administered to him in May 2023, less than six months before the trial, indicated that he had used amphetamine and methamphetamine, but he claimed that he had not used drugs since June or July 2022. He said he

had used methamphetamine once since being released from jail in May 2022. He also testified that he drank "a lot by myself" and that, at times, he got "pretty lit."

Starling testified that DHR performed an Accurint search for relatives of the mother and of the father and mailed letters to those family members about serving as relative resources for the child. Three of the father's relatives responded to the letters; however, Starling said, the father's paternity had not yet been adjudicated so those people were not eligible to serve as relative resources. She said that she had informed two of those relatives that, if the father became the child's legal father, they could contact DHR again. It is unclear from the record whether those two relatives got back in touch with DHR. One of those three failed to contact DHR after the father's paternity was established in May 2023, she said. A fourth relative responded on behalf of her son and his fiancée, but the relative herself said that she was not interested in caring for the child. Another of the father's relatives who expressed an interest in the child failed to respond to letters that DHR had sent her about completing forms for an Interstate Compact for Placement of Children ("ICPC") request.

M.D., a cousin of the father, testified that in August or September 2023, before the October 2023 trial, she had contacted DHR about being a possible placement for the child. She said that Kemeya Bolonas-Pile, a foster-care supervisor, was interviewing her over the telephone when Bolonas-Pile received an emergency call and had to end their conversation. M.D. said that Bolonas-Pile never called her back. M.D. also said that she never received paperwork regarding the ICPC even though she had asked about it a number of times. M.D. testified that she had known the child was in foster care for a year, but, because she was in college in Arizona, she was initially unable to care for the child. She said that she had moved back to Florida four days before the trial to help with the child and said that she was still interested in being a placement for the child. She said that Bolonas-Pile informed her that she was not within the necessary degree of kinship to be considered a relative placement but that she would be eligible to be a foster parent. Bolonas-Pile testified that she spoke with M.D. in September 2023, a month before the trial, and M.D. told her that she "was getting herself together" and had some things she still needed to work on.

None of the people identified as the mother's relatives responded to DHR's letters, and the mother did not provide DHR with the names of any possible resources, Starling said. Additionally, Starling said, no one from the mother's family came forward to care for the child. Starling said that the fact that the parents' parental rights were terminated to their six older children indicated that there may not have been any viable relative resources. The mother opined that placing the child in the father's custody was a viable alternative to terminating her parental rights.

Starling testified that the child had lived with the same foster parents since leaving the hospital and that she had found the child to be comfortable in that placement. She added that she had observed an attachment and filial bond between the foster parents and the child that the foster parents wanted to be a "long-term resource" for the child, and that the permanency plan for the child is adoption by the foster parents. L.M., the foster mother, testified that she and her husband had bonded with the child, loved the child, and wanted to adopt the child. She said that the foster parents were the only family the child had ever known,

and she believed that it would be unhealthy for the child for the bond between them to be severed.

The mother said that she did not really know the child at all and that the child, who was almost two years old at the time of the trial, had likely bonded with the foster parents. However, she disagreed that removing the child from the foster parents would be detrimental to the child's health or happiness because, she said, the child had bonded with the father. She said that the father had been able to visit the child several times after he was released from prison about 18 months before the trial. Starling disagreed with the mother, saying that she believed that removing the child from the foster parents would be traumatic for the child.

On October 31, 2023, the juvenile court entered a judgment terminating the parental rights of the mother and of the father. It found that the parents were unable or unwilling to discharge their responsibilities to and for the child, that their conduct or conditions rendered them unable to properly care for the child, and that their conduct or conditions were unlikely to change in the foreseeable future. The juvenile court also determined that no viable alternatives less drastic

22

than the termination of the parents' parental rights were available to serve the best interests of the child. The mother and the father appealed.

Because the juvenile court conducted a bench trial at which it received oral testimony, the ore tenus standard of review applies to this appeal. Kennedy v. Boles Invs., Inc., 53 So. 3d 60, 67 (Ala. 2010). According to that standard, "[w]hen a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error." Allstate Ins. Co. v. Skelton, 675 So. 2d 377, 379 (Ala. 1996). "The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses." Hall v. Mazzone, 486 So. 2d 408, 410 (Ala. 1986). The ore tenus rule applies to disputed fact issues, "whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence." Reed v. Board of Trs. for Alabama State Univ., 778 So. 2d 791, 795 (Ala. 2000). It does not, however, apply to questions of law or the application of law to facts, which we review de novo. Espinoza v. Rudolph, 46 So. 3d 403, 412 (Ala. 2010).

"A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence." P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 795 (Ala. Civ. App. 2013). "Clear and convincing evidence" is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." § 6-11-20(b)(4), Ala Code 1975.

When considering whether to terminate a parent's parental rights, a juvenile court is required to apply a two-pronged test. Ex parte T.V., 971 So. 2d 1, 4 (Ala. 2007). First, the juvenile court must determine whether there are statutory grounds for termination. Id. Section 12-15-319(a), Ala. Code 1975, provides:

> "If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."

The statute provides a non-exhaustive list of factors a court should consider in determining whether to terminate parental rights. § 12-15-319(a), Ala. Code 1975. Next, the juvenile court must determine whether

there are viable alternatives to terminating the parent's parental rights. T.V., 971 So. 2d at 4-5.

The mother does not contend on appeal that there were not statutory grounds to terminate her parental rights. Instead, she focuses on the second prong, arguing that clear and convincing evidence did not support the juvenile court's finding that there were no viable alternatives to the termination of her parental rights. In support of this contention, she argues, in effect, that the father's parental rights should not have been terminated and that the child should have been placed with him.

As noted above, in his appeal, the father challenged only the juvenile court's jurisdiction over the case. He did not challenge the merits of the juvenile court's judgment terminating his parental rights. Although we question whether the mother has standing to argue that the father's parental rights should not have been terminated, see B.H. v. Marion Cnty. Dep't of Hum. Res., 998 So. 2d 475, 477 (Ala. Civ. App. 2008), even assuming she is permitted to raise that issue as a necessary concomitant to her argument that placing the child with him was a viable alternative to terminating her parental rights, we conclude that the mother's argument in this regard lacks merit.

Among the factors a court should consider in determining whether a parent's parental rights should be terminated is whether that parent's parental rights to the child's siblings have been involuntarily terminated. See § 12-15-319(a)(8), Ala. Code 1975. In this case, the father's parental rights had been terminated to his six older children before the juvenile court determined that his parental rights to the child at issue were due to be terminated. Moreover, in addition to having his parental rights to the six older children terminated, a hair-follicle drug test performed on the father five months before trial was positive for amphetamine and methamphetamine. Based on the father's history of drug use, the juvenile court was free to question his contention that he had rehabilitated himself to the point that he could resume having custody of the child. See R.L.M.S. v. Etowah Cnty. Dep't of Hum. Res., 37 So. 3d 805, 811 (Ala. Civ. App. 2009). Additionally, the father failed to demonstrate that, despite being out of prison for more than a year, at the time of the trial he had transportation, stable housing, or stable employment. Thus, the

26

undisputed evidence supported the juvenile court's finding that grounds existed to terminate the father's parental rights.[1]

The mother also contends that the juvenile court failed to consider placing the child in the custody of multiple paternal relatives, particularly the father's cousin, M.D., who testified at the trial that she was willing to serve as a relative resource for the child. The mother also points out that, after the father's paternity was established, DHR failed to reach out to some of the father's relatives who had expressed an interest in serving as relative placements in 2021, when the child was first placed in DHR's custody.

In the present case, the child has been in the foster parents' home since only a few days after her birth, and the foster parents' home is the only home the child has known. After the child's birth, the father waited nearly a year and a half before taking steps to establish his paternity, and, the evidence shows, he was not in prison for most of that time. There

---

[1]To the extent that the mother's argument can be construed to assert that terminating the parental rights of the father was improper because there were viable alternatives to terminating his rights, the alternatives she posits -- placing the child with relatives -- do not support her argument that the child should have been placed with the father, and, thus, do not support her contention that reversing the termination of the father's parental rights would inure to her benefit.

27

is no evidence indicating that, after DHR initially contacted the father's relatives, any of them attempted to meet the child or to stay in contact with the father or DHR in the event that the father's paternity was established and they could then serve as relative placements. Meanwhile, during the year and a half it took the father to establish his paternity, the child and the foster parents became attached and emotionally bonded with each other. The foster parents desire to adopt the child. It is worth noting that none of the father's family members had custody of the older six children as to whom the father's parental rights had been terminated.

Additionally, a juvenile court is not required to consider a relative resource for a child if "[t]he relative did not attempt to care for the child or obtain custody of the child within four months of the child being removed from the custody of the parents or placed in foster care, if the removal was known to the relative," and the current permanency plan is adoption by the current foster parents. § 12-15-319(c), Ala. Code 1975. Here, M.D. was aware that the child was in foster care, but she waited until just a few months before the trial -- after she had finished school in Arizona -- before putting herself forward as a possible relative placement for the child. Given that lapse of time, coupled with the evidence

28

indicating that she was not within the degree of consanguinity to be considered a relative resource, see § 12-15-301(11), Ala. Code 1975, we cannot say that the juvenile court erred in refusing to award her custody of the child as an alternative to terminating the father's parental rights.

<u>Conclusion</u>

For the reasons set forth above, we conclude that the juvenile court properly exercised subject-matter jurisdiction over this action under the UCCJEA and that neither parent has demonstrated that the juvenile court erred in terminating their parental rights. Therefore, the juvenile court's judgment is affirmed.

CL-2023-0794 -- AFFIRMED.

CL-2023-0805 -- AFFIRMED.

Edwards, Hanson, Fridy, and Lewis, JJ., concur.

Moore, P.J., concurs in the result, with opinion.

MOORE, Presiding Judge, concurring in the result.

I agree with the main opinion that the judgment entered by the Houston Juvenile Court ("the juvenile court") terminating the parental rights of W.S. II ("the father") and of E.A. ("the mother") should be affirmed, but I disagree with the jurisdictional analysis contained in the opinion. I write specially to address that issue.

The record that is now before this court upon return from remand to the juvenile court shows that, on November 2, 2021, the mother, a Florida resident, intentionally crossed state lines to give birth to E.S. ("the child") in a Dothan hospital to evade Florida child-welfare and criminal authorities. After the mother and the child tested positive for methamphetamine, and the mother was arrested, the Houston County Department of Human Resources ("DHR") obtained protective custody of the child and, based on those circumstances, DHR filed in the juvenile court a dependency petition relating to the child on November 9, 2021. On November 10, 2021, the juvenile court entered a shelter-care order in which it determined that it had temporary emergency jurisdiction over the case.

Pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ("the UCCJEA"), Ala. Code 1975, § 30-3B-101 et seq., an Alabama juvenile court "has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." Ala. Code 1975, § 30-3B-204(a). No party disputes that the juvenile court properly assumed temporary emergency jurisdiction over the case. Pursuant to that jurisdiction, the juvenile court awarded DHR "pendente lite" custody of the child, subject to a determination of its jurisdiction to proceed further in the matter. DHR subsequently placed the child with foster parents, who reside in Alabama.

On June 23, 2022, the juvenile court conducted an adjudicatory hearing on the dependency petition. At that hearing, the juvenile court indicated that it had unsuccessfully attempted to contact the appropriate Florida-court judge to ascertain whether a child-custody proceeding relating to the child had been commenced in Florida. The juvenile-court judge then orally determined that it had jurisdiction under the UCCJEA

31

"because the child is in Alabama, and I have not had any contact with anybody in the Florida judicial system regarding this child." The juvenile court subsequently entered a judgment finding the child dependent and awarding custody of the child to DHR. In that judgment, the juvenile court stated: "[T]his court has jurisdiction based on facts presented."

"When acting under [temporary] emergency jurisdiction, however, a juvenile court may not adjudicate a child dependent or make an award of custody, other than a pendente lite award of custody." C.H. v. Lamar Cnty. Dep't of Hum. Res., 324 So. 3d 391, 395 n.2 (Ala. Civ. App. 2020) (citing M.B. v. B.B., 244 So. 3d 128, 132-33 (Ala. Civ. App. 2017), and R.S. v. B.C., 248 So. 3d 10, 13 (Ala. Civ. App. 2017)). However, the UCCJEA authorizes a court that has acquired only temporary emergency jurisdiction over a child to make a final child-custody determination in limited circumstances. See Official Comment to Ala. Code 1975, § 30-3B-204. Specifically, § 30-3B-204(b) provides:

> "If there is no previous child custody determination that is entitled to be enforced under this chapter and a child custody proceeding has not been commenced in a court of a state having jurisdiction under [Ala. Code 1975, §§] 30-3B-201 through 30-3B-203, a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under [§§] 30-3B-201 through 30-3B-203. If a child custody proceeding has not

32

been or is not commenced in a court of a state having jurisdiction under [§§] 30-3B-201 through 30-3B-203, a child custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child."

Section 30-3B-204(b) allows a juvenile court that has exercised temporary emergency jurisdiction to make a final child-custody determination when no other child-custody determination has been made and no other child-custody proceeding relating to the child has been commenced in another state with jurisdiction under the UCCJEA, so long as the determination "so provides and this state becomes the home state of the child."

In this case, the juvenile court originally awarded DHR only "pendente lite" custody of the child, and it recognized that it could not find the child dependent and award any other form of custody to DHR without first obtaining jurisdiction to do so under the UCCJEA. Upon finding that the child had been living in Alabama since his birth and that no other child-custody proceeding relating to the child had been commenced in Florida, the juvenile court determined that it could enter a final judgment finding the child dependent and awarding DHR permanent custody of the child. The juvenile court did not cite § 30-3B-

33

204(b) in the dependency judgment, but it is apparent that the juvenile court was relying on that provision when it determined that it had jurisdiction to enter a final adjudicatory and a permanent custody order in the dependency case.

Under 30-3B-204(b), "an emergency custody determination made under this section becomes a final determination, <u>if it so provides</u>." Official Comment to § 30-3B-204 (emphasis added). The juvenile court did not expressly state in the dependency judgment that it was making a "final child custody determination under the UCCJEA." However, in my opinion, § 30-3B-204(b) is satisfied if the language and the context of the judgment indicate that it is intended to be a final child-custody determination under general Alabama law. See <u>In re Saida A.</u>, 71 Misc. 3d 611, 624, 143 N.Y.S.3d 501, 511 (N.Y. Fam. Ct. 2021) ("[A]ny final order of custody, including an order of placement with [the New York City Administration for Children's Services], which this court may issue in the instant case, will be a 'final determination' under the UCCJEA." (citing <u>Paul v. Paul</u>, 161 A.D.3d 888, 891, 77 N.Y.S.3d 88 (2018)). Although subject to exceptions inapplicable in this case, "in the context of juvenile dependency orders, an order determining that a child is (or

34

that a child remains) dependent coupled with a disposition of that child's custody is a final judgment ...." Marshall Cnty. Dep't of Hum. Res. v. J.V., 203 So. 3d 1243, 1247 (Ala. Civ. App. 2016). The language of the dependency judgment, when viewed in the context in which it was entered, clearly shows that the juvenile court intended to and did enter a final child-custody determination within the meaning of Alabama dependency laws and the UCCJEA. See Rule 58(b), Ala. R. Civ. P. In other words, the dependency judgment "provides" that it is a final child-custody determination.

The courts of other states have indicated that, in at least some circumstances, a judgment should expressly state that it is intended as a final child-custody determination in order to satisfy § 30-3B-204(b). See, e.g., In re E.D., 812 N.W.2d 712, 721 (Iowa Ct. App. 2012) (holding that, because emergency-removal order did not expressly provide that it was a final determination, the court could exercise only temporary emergency jurisdiction); In re Z.H., 245 W. Va. 456, 468, 859 S.E.2d 399, 411 (2021); In re Marriage of Wang & Zhou, 62 Cal. App. 5th 1098, 1107, 277 Cal. Rptr. 3d 302, 308 (2021). On the other hand, some courts have construed the same provision more broadly when the context shows substantial

compliance with the finality-determination requirement.  See In re K.M., 771 N.W.2d 651 (Iowa Ct. App. 2009) (table) (holding that order entered based on temporary emergency jurisdiction ripened into permanent order when no other state proceeding was maintained and case proceeded to termination of parental rights as final determination); accord Terrell v. Arkansas Dep't of Hum. Servs., 2015 Ark. App. 582, 4, 474 S.W.3d 90, 92 (2015); In re N.B., 289 N.C. App. 525, 533, 890 S.E.2d 199, 204 (2023) (holding that court's temporary emergency jurisdiction may ripen into home-state jurisdiction under the UCCJEA by mere passage of time when no other child-custody proceeding is commenced in another state); Interest of K.L.B., 56 Kan. App. 2d 429, 444, 431 P.3d 883, 894 (2018).  It would be helpful if an Alabama juvenile court would insert explicit language tracking § 30-3B-204(b) when it is relying on that statute to assert jurisdiction over the custody of a child, but I do not find that it is necessary for it to do so when, from the context of the case, we can readily ascertain its intention.  This court has long recognized that it may infer necessary findings to allow appellate review of judgments affecting the custody of a dependent child to avoid delay in disposing of the appeal.  See, e.g., J.P. v. S.S., 989 So. 2d 591, 598 (Ala. Civ. App. 2008) ("[I]n the

interest of judicial economy this court may hold that a finding of dependency is implicit in the trial court's judgment."). That principle militates heavily toward treating the dependency judgment in this case as a "final determination" within the meaning of § 30-3B-204(b).

The record further indicates that Alabama had become the home state of the child before the entry of the dependency judgment. The shelter-care order vested legal and physical custody of the child in DHR, which exercised physical custody of the child through a foster-care arrangement. Since November 10, 2021, DHR had been "a person acting as a parent" toward the child within the meaning of Ala. Code 1975, §§ 30-3B-102(12) and (13). Home-state jurisdiction attached six months later.[2] See Ala. Code 1975, § 30-3B-102(7). Therefore, the juvenile court

---

[2]I recognize that the term "home state" generally means "[t]he state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." Ala. Code 1975, § 30-3B-102(7). However, in the context of Ala. Code 1975, § 30-3B-204(b), the legislature obviously intended that Alabama could become the home state of a child subject to the temporary emergency jurisdiction of a court by living in this state for six months with a person acting as a parent; otherwise, § 30-3B-204(b) would have no field of operation. See generally B.F. Goodrich Co. v. Butler, 56 Ala. App. 635, 647, 324 So. 2d 776, 787 (Civ. 1975) (holding that individual statutes in one comprehensive act should be construed so that each is afforded a field of operation).

had subject-matter jurisdiction under § 30-3B-204(b) when it entered the dependency judgment.

Once the juvenile court entered the dependency judgment, it retained continuing, exclusive jurisdiction over custody proceedings relating to the child. See Ala. Code 1975, § 30-3B-202(a). The juvenile court properly acted pursuant to that jurisdiction when it entered the judgment terminating the parental rights of the mother and of the father. As other courts have consistently held, when temporary emergency jurisdiction ripens into home-state jurisdiction under § 30-3B-204(b), the court acquires jurisdiction to terminate parental rights. See, e.g., Sha'quia G. v. Department of Child Safety, 251 Ariz. 212, 488 P.3d 994 (Ct. App. 2021); Trevino v. Arkansas Dep't of Hum. Servs., 2022 Ark. App. 182, 645 S.W.3d 19 (2022); Terrell v. Arkansas Dep't of Hum. Servs., supra; Interest of K.L.B., supra; In re J.C.B., 209 S.W.3d 821 (Tex. Ct. App. 2006).

The juvenile-court judge who presided over the termination-of-parental-rights proceedings, who was not the same judge who presided over the dependency proceedings, did not analyze the jurisdictional issue exactly as I have in this special writing. However, subject-matter

38

jurisdiction is a question of law that this court reviews de novo, and we are not bound by the reasoning of the trial court as to that question. See Taylor v. Paradise Missionary Baptist Church, 242 So. 3d 979, 986 (Ala. 2017). The juvenile court was correct in finding that it had subject-matter jurisdiction over the termination-of-parental-rights proceedings, regardless of how it reached that decision, so I agree that the judgment is valid and that it should not be reversed for jurisdictional reasons.